UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARKSDALE SCHOOL PORTRAITS LLC d/b/a HOCKMEYER WITH BARKSDALE, and BSP NEW ENGLAND, LLC d/b/a HOCKMEYER WITH BARKSDALE<br><br>*Plaintiffs*,<br><br>-v-<br><br>ELIZABETH HOCKMEYER WILLIAMS And E-LLUMINATIONS,<br><br>*Defendants*.<br>_____<br>ELIZABETH HOCKMEYER WILLIAMS, E-LLUMINATIONS (a d/b/a of JCW CONSULTING, LLC)<br><br>Counter and Cross-Claim Plaintiffs<br><br>-v-<br><br>BARKSDALE SCHOOL PORTRAITS LLC d/b/a HOCKMEYER WITH BARKSDALE, BSP NEW ENGLAND, LLC d/b/a HOCKMEYER WITH BARKSDALE, WAYNE BARKSDALE, individually, and SUSAN SHERIDAN, individually.<br><br>Counterclaim Defendants, | Civil Action No. 1:20-cv-11393-IT<br><br>Partially consolidated for discovery purposes with Civil Action No. 1:20-cv-11640-IT |

## **OPPOSITION TO MOTION FOR SANCTIONS**

Defendants hereby oppose the Motion for Sanctions ("Motion") brought by Plaintiffs and, for the reasons below, the Motion should be denied.

1

## INTRODUCTION

This is a case that is premised upon an unfortunate abuse of power, and a three-plus year time-frame of causing intentional harm and suffering to Elizabeth Williams ("Elizabeth") and her husband, Jeff Williams ("Jeff"). The emotions of the parties case have been escalated by the improper and inflammatory behavior of Attorney Homans, taunting Elizabeth at her deposition, which is grounds for denial of the Motion in and of itself, because it was unprofessional and untoward conduct to a highly fragile plaintiff. Given this Court will be reviewing the video of the deposition, this matter should be reviewed as well,[1] as the unclean hands with which Plaintiffs come to the Court are grounds to deny the Motion entirely. (*See* Citations, *infra*) Moreover, the sanctions sought by Plaintiffs are disproportionately harsh given the hundreds of difficult questions asked of Elizabeth, only a handful of objections to them, and the truthful answers to all of them.

## BACKGROUND AND ARGUMENT

Plaintiff Wayne Barksdale ("Wayne") acquired the "Hockmeyer Studios" company owned by Brian and Ann Hockmeyer ("Brian and Ann"), Elizabeth's parents, in August 2018. Wayne's company is reportedly owned by him, his brother and his sister.

Elizabeth became the key employee in the New England region thereafter. However, the acquisition was such that Plaintiffs did not pay any up-front money to Brian and Ann. Instead,

---

[1] The undersigned is in receipt of the Court's Order, Document No. 51. Pending the official transcription Ordered thereunder, the undersigned references the transcript emailed to the court last evening at the following points. These points will be supplemented upon the Official Transcript becoming available. Transcript, 21:05, 23:15, 28:15-33, 38:20, 42:50, 1:14:30; 1:34:30; 1:35:30; 1:37; 1:41; 1:44; 1:49:40; 1:50-1:51; 1:53:45; 1:55:15; 2:36:50; 2:44:10; 2:45-56; 2:58:40; 3:04:45; 3:13:50; 3:22:15; 3:31; 3:32:55; 3:38:50; 3:47:45; 3:38:20; 3:53; 3:58:20; 3:59:30; 4:04:15; 4:18:55; 4:24:20; 4:26:20-40; 4:49:23-4:51:15 5:02:45; 5:28; 5:50:50; 5:54; 6:01:05.

they earned an approximate 10% percent of revenue from the revenue generated in New England for the four 1-year periods thereafter (August 2018-August 2019, August 2019 to August 2020, August 2020-2021, etc.). (See Exhibit A, Section 3.1)  That gave Wayne Barksdale ("Wayne") and his wife, Susan Sheridan ("Susan"), National Sales Manager, substantial power over Elizabeth.  Making matters worse based on what would occur after the acquisition, Jeff was hired by the company as its Information Technology Director.  That put Jeff firmly under the thumb of Wayne and Susan as well.

     The acquisition closed in or about August 2018.   Wayne Barksdale traveled to Massachusetts shortly thereafter.  Upon his arrival to the Hockmeyer Studios office in Massachusetts, and despite having known Elizabeth for over a decade through conferences in the industry by that time, Wayne approached her and, as Elizabeth describes in her deposition, kissed her for more than 5 seconds on the mouth.  He had never kissed her on the lips before, which is undisputed.  Wayne did that in front of Jeff and others, and Jeff had to be held back by fellow employee, Mo Ehtasham, because Jeff intended to become physical with Wayne having witnessed that, as Jeff testified at his deposition.  In addition to this unlawful behavior, Wayne was also regularly, and generally, highly aggressive, angry and overall abusive toward Elizabeth.  He had actually bragged to her that, after a prior acquisition of another company, he had "intentionally" drove the seller crazy.  As Elizabeth described at her deposition, Wayne kissed her every time he came to New England after that.  And, he did so again through his last time seeing her before the COVID crisis in January 2020 at a conference in Las Vegas.

     Even Wayne agreed at his deposition that it is inappropriate for a supervisor to kiss a subordinate.  Ironically, however, this was how he ended up with Susan.  Specifically, in 2010, after Susan had been working for the company for 6 years, they started a relationship and got

married in December 2018, after having lived to together for a number of years and 4 months after the acquisition of Hockmeyer Studios (and, as Jeff reports, supposedly due to pressure from Susan who witnessed Wayne taking a romantic liking to Elizabeth).  Susan rose in power at the company thereafter and was made National Sales Manager at the time of the Hockmeyer Studios acquisition. Susan had started with the company as a part-time photographer in 2004.

      Elizabeth tried to complain to Belle Lawrence ("Lawrence"), who was admittedly in charge of Human Resources, on at least two occasions, and while Lawrence told Elizabeth she deserved better, Lawrence failed to correct the misbehavior at all.  Truly, there was nothing she could do.  Wayne's company was family owned, and Lawrence had been their loyal employee for numerous years, growing with the company as well.  That said, Lawrence also acknowledged at her deposition that it was inappropriate for a supervisor to kiss a subordinate.

      As Elizabeth and Jeff both testified at their depositions, Wayne held their family's entire financial future in his hands, including both of them and Elizabeth's parents.  Jeff resigned a little less than 1-year later, in July 2019.  As he told Wayne, continuing in the job would mean the end of his marriage.  Indeed, Elizabeth and Jeff have disclosed in this case their private text messages to each other.  Overall, they describe the devotion and love Jeff has for Elizabeth, their struggles as a couple, and the ups and downs of their lives in general.  They have made their private text messages an open book in this case.  They have also willingly signed releases for all of their medical and psychological records in response to Attorney Homans' discovery requests, all without any effort to preclude any discovery, however invasive.  At their depositions, Attorney Homans clearly intended to embarrass them with their private text messages and information in their medical records at their depositions, as the video transcript also reflects, and which was also highly questionable.

After Jeff resigned, he asked to be paid his accrued and unused vacation time (approximately 80 hours), but was denied it. He brought up the need to be paid these wages under Massachusetts law. It was still denied. Yet, from the moment he resigned, there is documented evidence and undisputed testimony that the company would continue to need and seek his services thereafter. And, it is undisputed that Jeff would continue to serve the company in multiple ways for months thereafter. Lawrence was clearly prepped at her deposition to state that Jeff only assisted with passwords after his resignation. It was an incredible claim. Presented with some of the evidence Jeff had produced, she recanted, and only reconciled on the admission that while Jeff worked for the company, the hours he logged were inflated. To be sure, Jeff performed far more than 80 hours of work over the months that followed. He performed hundreds of hours of work. (See Exhibit B[2]) Multiple employees were calling on Jeff repeatedly to assist; he was the former IT Director, and Wayne failed to replace him at all after his resignation. Jeff felt stuck too, and as he reported in one text message to Wayne, he was working 4-6 hours per day, and risking his new job. (See Exhibit C) Wayne did not even respond to that text, and it is undisputed he never paid Jeff for any of his post-resignation services. He knew he Jeff caught between a rock and hard place.

When COVID occurred and there were government shut-downs in March 2020, Elizabeth and everyone else in New England was laid off. However, there remained substantial work to do in New England. Elizabeth continued to work, undisputedly, and undisputedly without any ongoing salary. She fielded calls and emails from customers, coordinated such work over an undisputed 52 minute call with Wayne and Susan on April 21, 2020, and she took care of the

---

[2]   Jeff noted two typos in Exhibit B at his deposition where his hours were inadvertently recorded wrong on two days.

5

physical office itself. Wayne acknowledged that she did so at his deposition, but notably, claimed she was doing so "to help her parents' business" due to the ongoing revenue they would receive from her efforts. (That said, Wayne further had to acknowledge when presented with Exhibit A hereto in response to that testimony that 88-90% of that revenue would belong to his company, while only about 10-12% of that revenue was to benefit her parents.)[3] Attorney Homans has failed and refused to produce any of the emails that customers sent to her post-layoff in March 2020, and this is addressed in Defendants-Counterclaim Plaintiffs' separate motion to compel.

Then, on a Zoom call with Susan on May 7, 2020, Susan "fired" Elizabeth. Susan says Elizabeth quit. Wayne says Susan did not have the authority to fire Elizabeth. The entire debate is notable: it is undisputed Elizabeth was laid off in March, and it is undisputed she was not being paid between March and May 7, 2020. Yet, Plaintiffs filed a pleading saying that Elizabeth was "still employed" through May 7, 2020. (See Document 30, 1:20-cv-11393-IT, Exhibit D hereto, ¶¶ 11, 18) However, Wayne has testified at his deposition that this position in his pleading was false. Yet, Wayne and Susan have still made this a debate, taking the position at their depositions that Susan did not have the authority to fire Elizabeth. This is perhaps because on that call, Susan admitted at her deposition that Elizabeth was anxious about all of the customer calls and photography that was upcoming in June, 2020, and was wondering what the company's plan was, given that it had no employees and was not paying any employees in New England, and given Elizabeth would be expected to deliver for those customers. Elizabeth needed help to meet those customers' needs. Susan's response to her was simply that she should

---

[3] Wayne's testimony on this point is notable, as it evidences his awareness that Elizabeth was "stuck" in a situation of trying to take care of her parents, and also endure what he was doing to her. It was in effect, an acknowledgement of the power he had over her inherently given her role.

have planned for it sooner, and she should figure it out and, in essence, "hop to it" right away. Elizabeth got angry and replied that she was done working for free, and then, there arises the dispute about whether Susan "fired" Elizabeth or somehow "resigned" and whether Susan had the authority to fire Elizabeth.

This disputed issue has caused the following on Plaintiffs' part. First, in Plaintiffs' Answer and Affirmative Defenses to Elizabeth's counterclaims, Plaintiffs state that Elizabeth had a "dotted line" reporting relationship to Susan. (See Exhibit D at 6)  At his deposition, however, Wayne stated that this statement in his pleading was also false and that Susan had no authority over Elizabeth. It was an incredible claim given Susan's mere title, and the fact that she is Wayne's wife. More concerning, completely missing from Plaintiffs' document production were any documents or emails between Susan and Elizabeth over the years. At her deposition, however, Susan stated that she had provided all of those documents to counsel for Plaintiff, Attorney Homans. This matter was the subject of inquiry in discovery requests as well, but not produced by Attorney Homans.

Plaintiffs' complaint is premised, in part, on Elizabeth having engaged in wrongdoing after May 7, 2020, including with her May 12, 2020 letter to customers. First, the text of the letter is neutral, and it directs customers to get in touch with Wayne if they have questions. Second, it is undisputed Elizabeth was not under a non-compete or non-solicit, so there were no restrictions on her soliciting customers. Third, to the extent there was any harm from that letter (which there was not), it is curious that no one from the company even came to Massachusetts to try to retain business until June 11, 2020. Yet, this letter begat the premise for Plaintiffs' lawsuit – that Elizabeth somehow did not have the right to start her own business and compete, and it is still featured in Plaintiffs' Motion. (See Motion, Exhibit 4)

While Plaintiffs were also concerned that Elizabeth took information from them, that is not the case. Elizabeth has answered discovery on that matter fully and fairly. As Elizabeth testified, nearly coming to tears at her deposition, all of her personal photos from the years and other personal information was on the Barksdale servers, and she tried to retrieve it. That is what the text is about that is attached to Plaintiffs' Motion for Sanctions, and Elizabeth testified about that at her deposition. (See Motion, Exhibit 3)

In short, Jeff worked for free and, after her layoff, Elizabeth worked for free. Wayne, Susan, Lawrence and others were well aware of all of it. Yet, after Wayne decided that he did not like the letter she sent on May 12, 2020, Elizabeth was first met with a settlement effort that attempted to drive her into agreeing to a non-compete/non-solicit, and sharing a substantial percentage of her revenues of her competing company with Wayne for a period of time thereafter: in essence, using the threat of a lawsuit to bully Elizabeth into giving him some of her revenue for competing (and asking for an amount of money from her that would mean that, in effect, Elizabeth would be paying her own parents, and paying Wayne atop that, for the remainder of her parents' 4-year buy-out period). Further, Wayne stopped paying Elizabeth's parents completely, including on pre-COVID revenues from August 2019 to March 2020, and there is testimony in the deposition about that matter as well, and the settlement efforts that were attempted to permit Wayne to avoid his eventual settlement payment obligations to Elizabeth's parents entirely.[4]

As Elizabeth testified at her deposition, she could not agree to any of those terms. They were untenable. But, torn and potentially willing to accept them, she provided leads to Wayne's company, so that he would see her acting in good faith and simply part ways amicably. For

---

[4] The undersigned represented Brian and Ann in that settlement, and Attorney Homans represented Mr. Barksdale and his company.

Elizabeth, this was just another tactic by Wayne to control her and bully her, and for her, the result was in her words at her deposition, the biggest failure of her life, because she ended up with this lawsuit. This lawsuit is something she never wanted but, as she testified at her deposition, it is something she is determined to see through and endure because she is finally standing up to Wayne, as difficult as that is, and as difficult as Attorney Homans tries to make it.

Elizabeth describes in her deposition how this lawsuit itself is emotionally taxing, and the details of that are in her deposition and what it has done to her, particularly in December 2020 (including a voluntary commitment to an in-patient facility). At the start of her deposition, Elizabeth is asked multiple questions about the medications she is on. The testimony lasts several minutes. She is asked several questions about her propensity to tell the truth in various areas, eventually leading to the undersigned to instruct her not to answer, immediately leading Attorney Homans to call the Court. This testimony was all part of the initial lines of questioning in the earliest parts of the day, as this Court will see.

Not on the record at Elizabeth's deposition, but on the record at Jeff's deposition, Elizabeth was hospitalized in the week leading up to her deposition, and the night after her deposition, she was taken by ambulance and hospitalized again. At the start of her deposition, Elizabeth acknowledges she was on substantial medication at the time of her deposition.

For all of these reasons, Elizabeth did not want to be alone in a room for her deposition. She wanted her husband Jeff present (who is also a party, as the owner of defendant, JCW Consulting ("JCW")). Counsel for Plaintiffs did not object to Jeff's presence or request any sequestering. She also wanted the undersigned counsel in the room. The COVID rules are such that persons wear masks in that situation, so all did. In particular, as Elizabeth testified, she

9

considers herself high-risk. All of Elizabeth's testimony is truthful; she swore to tell the truth, and a full viewing of her deposition presents her as a credible witness, fully telling the truth.

Simultaneously, she was met at the deposition with nearly 8 hours of questioning, including multiple snide remarks, threats, and off-color commentary and side-comments and mutterings by Attorney Homans. (See Note 1 *supra*) The undersigned had to ask and remind Attorney Homans to be professional multiple times, as the video transcript reflects.

Elizabeth had to face on screen Wayne, Susan and Belle, who were all present on Zoom for the deposition. (The video recording only shows the speakers, however, and does not show everyone present on the screen.) That said, the undersigned notes that Susan was making facial expressions during Elizabeth's testimony, sometimes shaking her head as well at least once as if to say, "no" (and which the record captured at 5:02:45 by way of counsel's comment to allow the record to reflect that). Susan also had an ear-piece in her ear and was communicating with someone during the deposition.

The deposition lasted from 10:00 a.m. to just past 6:00 p.m., with a total of only approximately 1 hour of breaks (not including the court conference and argument on the disputed issue at the deposition). There were hundreds of questions, seemingly endless, most of them compound, many of them confusing, numerous of them repetitive and harassing and nearly all of them objectionable. Yet, there were only a handful or so of actual objections from the undersigned.

The sound situation in the conference room was extremely poor, and it was the undersigned's first in-person deposition in the office since March 2020. Anytime the undersigned "unmuted," as this Court will hear in its review of the transcript, there was a "tin-

10

like" echo in the room. Thus, there was a need to stay on mute unless speaking. Jeff stayed on mute also, but like Elizabeth, he was extremely stressed and upset.

Jeff's deposition was to follow two days later. He also is on substantial medication. His wife had just come out of the hospital. He knew her health was in poor shape. Both Jeff and Elizabeth just hoped to make it through the day and week and get through this difficult stage of their respective cases. Attorney Homans' multiple snide remarks and side commentary (see Note 1, *supra*) during the deposition made all of this extremely difficult. Of course, Wayne's presence did as well, as facing one's abuser is extremely traumatic.

Attorney Homans clearly sought to agitate Elizabeth and Jeff with many of his questions, even suggesting that Jeff was fired from a new job for a supposed sexual harassment allegation against him. Elizabeth was visibly and obviously agitated multiple times during the deposition. Ultimately, this is a highly emotional case for the parties. The undersigned did his best to keep her calm, help her get through the questions and be responsive to Attorney Homans, and to always tell the truth.

There are a number of handfuls of side remarks referenced in the Motion. There were other mutterings by unknown persons throughout as well. None of them tainted Elizabeth's truthful testimony. All of that testimony is, and was, and will remain, truthful. The video transcript submitted by Plaintiffs should be reviewed in full in this regard.

To the extent there were mutterings by the undersigned, they were commonly out of sheer frustration of the questions being asked by Attorney Homans and the difficulty in enduring them and Attorney Homans' side comments, and the fact that objecting to every question was going to lead to a dialogue with Attorney Homans (as noted above, Attorney Homans had called the court once already upon an instruction not to answer in the early questions of the day, as this

11

Court is aware), upset the witness and, as Attorney Homans threatened multiple times, lead to a "second day." There was a substantial concern that, given her medical state, Elizabeth would not even make it through this first day itself. Both Elizabeth and Jeff very much just needed to get through this day emotionally and physically. Worth noting, Elizabeth and Jeff believe that the Barksdale Parties' of this case and the claims asserted are part of an ongoing vendetta by Wayne, intended to destroy them, anger Elizabeth's parents, and Attorney Homans is his weapon/hired gun in that regard intentionally prying into private matters and medical records and behaving unprofessionally at their deposition to harass and intimidate them. To be sure, there were multiple examples of this on the record, as this Court's full review of the transcript will show. (See Note 1, *supra*) Yet, Elizabeth and Jeff have nothing to hide and have provided and will continue to provide all of the discovery Plaintiffs seek, however irrelevant and invasive.

As this Court is aware, in order to seek equity before the Court, a plaintiff must have "acted equitably." *New England Merchants Nat. Bank of Boston v. Kann,* 363 Mass. 425, 428, 294 N.E.2d 390 (1973). The false statements in pleadings by Attorney Homans highlighted above on behalf of his clients is one such act of unclean hands.[5] More on point, the consistent unprofessional behavior of Attorney Homans is the main act of unclean hands at-issue in the very deposition at-issue. The rule of being courteous to a witness is paramount. See Mass. R. Prof. C. 1.2(a). The rule of prompt and complete disclosure of relevant evidence is also paramount. See Mass. R. Prof. C. 3.4. This, in fact, is something that Elizabeth and Jeff believe Attorney Homans has not been timely and forthcoming with himself, and it is the subject of Elizabeth and Jeff's own motion to compel and for sanctions filed with this Court on May 14, 2021.

---

[5] When the transcript of Wayne's testimony is made available (as it was taken May 7, 2021), the cites to Wayne testifying that statements in these pleadings was false will be supplemented for the Court.

The doctrine of unclean hands has long held that "the doors of equity are closed 'to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior' of the other party." *Fidelity Management & Research Co. v. Ostrander,* 40 Mass.App.Ct. 195, 200–01, 662 N.E.2d 699 (1996), quoting *United States v. Perez–Torres,* 15 F.3d 403, 407 (5th Cir.1994); see also *Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 387, 64 S.Ct. 622, 88 L.Ed. 814 (1944) ("[H]e who comes into equity must come with clean hands"); *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 244–45, 54 S.Ct. 146, 78 L.Ed. 293 (1933). "[W]hile equity does not demand that its suitors shall have led blameless lives ... as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Fidelity Management & Research Co.,* 40 Mass.App.Ct. at 200–01, 662 N.E.2d 699, quoting *Precision Instrument Mfg. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). See also MacKay v. Crews, 2009 WL 5062119, at *5 n.8 (E.D.N.Y. Dec. 16, 2009) (denying sanctions under the unclean hands doctrine and citing, Pennecom B.V. v. Merrill Lynch & Co., Inc., 372 F.3d 488 (2d Cir. 2004) ("'The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity.' " (quoting *Bein v. Heath,* 47 U.S. 228, 247 (1848)).

While it is a confidential transcript, with this Court viewing it in full and with the transcript this Court Ordered to follow, and against this background above, this Court should conclude that the Barksdale Parties received a full and fair deposition, and it was a comprehensive deposition as well lasting over 7 hours with hundreds of questions and nearly no objections. This Court should conclude that, reviewing the transcript overall, and understanding

what Elizabeth is enduring, and how she needs professional help to make sure her truth is not obscured in the face of substantial adversity, there was no sanctionable conduct.  The undersigned regrets any taint on the deposition claimed, but it is the truth that matters.  All of Elizabeth's testimony is truthful.

Alternatively, it would be disproportionately harsh and prejudicial to grant any of the relief requested by the Barksdale Parties given the full context described above, Attorney Homans' own misconduct, Elizabeth's meritorious claims and defenses, her actual credible and truthful testimony, and the full and complete discovery she has and continues to permit without objection or motions to quash or limit.  Indeed, there is nothing inconsistent in anything she testified to at her deposition.  What she testified to has been her position since the start of this case.  She has done all she can to hold herself together and endure this, and she endured a long deposition and a long day under adverse circumstances already.

## CONCLUSION

For the reasons above, Plaintiffs' Motion for Sanctions should be denied.

Respectfully submitted,

**ELIZABETH HOCKMEYER WILLIAMS AND E-LLUMINATIONS**
By their counsel,

Dated: May 14, 2021

*/s/ Jeffrey M. Rosin*
Jeffrey M. Rosin, Esq. (BBO #629216)
Kenton J. Villano, Esq. (BBO #685959)
O'HAGAN MEYER, PLLC
111 Huntington Avenue, Suite 2860
Boston, Massachusetts 02199
(617) 843-6800
jrosin@ohaganmyer.com
kvillano@ohaganmeyer.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 14, 2021, a true copy of the above document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties who have appearances as of the time of this filing by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jeffrey M. Rosin*
Jeffrey M. Rosin, Esq.